IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 24, 2025

## STATE OF TENNESSEE v. DEMARQUSHON MARQUIS HINTON

**Appeal from the Circuit Court for Madison County**
**No. 24-66     Donald H. Allen, Judge**

_____

### No. W2024-01279-CCA-R3-CD
_____

A Madison County jury convicted Defendant, Demarqushon Marquis Hinton, of evading arrest in a motor vehicle with risk of death or injury, two counts of attempted second degree murder, two counts of employing a firearm during the commission of or attempt to commit a dangerous felony, theft of a firearm valued at less than $2,500, reckless driving, failure to obey a traffic control device, and failure to stop at a stop sign. The trial court imposed an effective sentence of twenty-four years to be served in confinement. On appeal, Defendant challenges the sufficiency of the evidence supporting his attempted second degree murder and firearm convictions, and he argues that his sentence is excessive. Upon review, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

MATTHEW J. WILSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and STEVEN W. SWORD, JJ., joined.

Joshua V. Lehde, Public Defender Fellow-Appellate Division Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); Jeremy Epperson, District Public Defender, and Austin Bethany, Assistant District Public Defender (at trial), for the appellant, Demarqushon Marquis Hinton.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Hornsby, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Matthew Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts and Procedural History

Defendant's convictions stem from his shooting at his former girlfriend, Persia Wallace, and her boyfriend, Kyler Brown, with a stolen firearm and then leading police officers on a high-speed chase on the afternoon of May 26, 2022. Defendant was indicted on charges of evading arrest in a motor vehicle with risk of death or injury, two counts of attempted first degree murder, two counts of aggravated assault, two counts of employing a firearm during the commission of or attempt to commit a dangerous felony, theft of a firearm valued less than $2,500, reckless driving, disobeying a traffic signal, and disobeying a stop sign. Defendant's case proceeded to trial on February 13, 2024.

### A. Trial

According to the evidence presented at trial, Defendant and Ms. Wallace had been in a relationship that ended sometime prior to 2022, and they had a son. Ms. Wallace began dating Mr. Brown a few months after her relationship with Defendant ended. Ms. Wallace testified that Defendant had threatened her previously through messages on Cash App that if he caught her with someone else, "it was over for [her]." She recalled an incident in March 2022 during which Defendant followed her as she was driving with a friend, and Ms. Wallace called the police as a result.

Ms. Wallace testified that on May 26, 2022, she and Mr. Brown were at her apartment in Madison County and that she left the apartment at around 4:30 p.m. intending to drive to her aunt's house. While Ms. Wallace was walking to her vehicle, a gray Kia Soul, she saw Defendant and one of his friends in Defendant's gold vehicle, which was parked "off to the side of the apartment building." Ms. Wallace stated that although Defendant occasionally visited their son at her apartment, he was not scheduled to be there that day. Upon seeing Defendant, Ms. Wallace became nervous due to his prior threats, and she called her mother and Mr. Brown while in her vehicle. Mr. Brown agreed to follow Ms. Wallace to her aunt's house to ensure that she arrived safely.

Mr. Brown left Ms. Wallace's apartment and went to his gray Ford Fusion hybrid, which was parked next to Ms. Wallace's vehicle. Ms. Wallace spoke to her mother and Mr. Brown on her cell phone over a three-way call, and Mr. Brown reassured Ms. Wallace's mother that he would follow Ms. Wallace. Ms. Wallace drove out of the parking lot in her vehicle, followed by Mr. Brown in his vehicle. Defendant pulled his vehicle behind Mr. Brown's vehicle and followed them. Ms. Wallace turned onto North Royal Street, followed by Mr. Brown and Defendant.

Ms. Wallace testified that Mr. Brown sent her a text message instructing her to turn off onto another street to determine whether Defendant was following them. Ms. Wallace turned onto East Forest Avenue, and Mr. Brown and Defendant followed her. She then heard gunshots. She looked behind her car and saw Defendant hanging out of the driver's side window of his vehicle with "something pointed out of the window." Ms. Wallace was unable to determine whether the item was a firearm but affirmed that Defendant had "something" in his hand. Ms. Wallace could not recall the number of gunshots that she heard. She stated that she was afraid and believed she was going to die. She said that although no bullets struck her vehicle, "they flew past [her] window."

Ms. Wallace turned onto a dead-end street while Mr. Brown continued driving straight and Defendant followed Mr. Brown. Ms. Wallace's mother ended her telephone conversation with Ms. Wallace to call 911, and Ms. Wallace continued talking to Mr. Brown on her cell phone. Ms. Wallace asked Mr. Brown for his location, and Mr. Brown stated that he could not tell her because Defendant was "right on his tail." Ms. Wallace heard police sirens and followed them to the area where officers were arresting Defendant. She confirmed that Mr. Brown was not injured and spoke to officers at the scene about what had occurred.

Mr. Brown testified that on May 26, 2022, he was at Ms. Wallace's apartment when she left around 4:30 p.m. to visit her mother and her child. Ms. Wallace called him and stated that Defendant was outside her apartment and beside the manager's office. Mr. Brown had not met Defendant previously, and at that time, Mr. Brown was unaware that Defendant was Ms. Wallace's former boyfriend. Mr. Brown said he agreed to follow Ms. Wallace to her mother's home. Once Mr. Brown exited Ms. Wallace's apartment, he saw Defendant's vehicle but did not know who was inside the vehicle. Ms. Wallace was inside her vehicle, and Mr. Brown walked to his vehicle, which was parked near Ms. Wallace's vehicle. While Ms. Wallace and Mr. Brown talked over their cell phones, Ms. Wallace drove out of the parking lot of her apartment complex; Mr. Brown pulled out behind Ms. Wallace; and Defendant drove behind Mr. Brown.

Mr. Brown testified that they each turned left onto North Royal Street at a stoplight and that Defendant "chased us all the way to East Forest Avenue." Mr. Brown stated that while he was talking to Ms. Wallace on his cell phone, he heard "something," and Ms. Wallace said she heard gunshots, which Mr. Brown stated "confirmed" what he believed he was hearing. Mr. Brown stated that upon hearing the gunshots, he was afraid. He did not look behind him, did not see a gun or anyone shooting at him, and did not know the direction in which the shots were fired. Mr. Brown explained that he was focused upon fleeing the area. Mr. Brown said Ms. Wallace turned onto a dead-end street while he continued driving straight. Defendant followed Mr. Brown. Mr. Brown sped through a

red light to escape from Defendant, but Defendant continued following him. Mr. Brown was able to flag down a police officer, who stopped Defendant and arrested him.

Sergeant Daniel Washburn of the Jackson Police Department ("JPD") testified that he received an alert of shots fired from ShotSpotter, a gunfire detection system placed in several areas in the city, and he and another officer proceeded to the area in Sergeant Washburn's police-issued black Dodge Charger. Once they reached the area, Mr. Brown drove up behind them and began blowing his horn. Sergeant Washburn pulled over to the side of the road and saw Defendant's gold vehicle following Mr. Brown's silver vehicle. Mr. Brown also pulled over to the side of the road. Sergeant Washburn motioned for Defendant to drive around them, and after Defendant did so, Sergeant Washburn pulled up behind Defendant and began following him. Mr. Brown then drove up beside Sergeant Washburn and informed him that a person in the gold vehicle had shot at him.

Sergeant Washburn testified that he did not immediately initiate a stop of Defendant's vehicle but waited for other officers to arrive. Once Sergeant Washburn initiated his blue lights, Defendant did not stop. Sergeant Washburn then activated his siren, but Defendant still did not stop. Defendant led Sergeant Washburn in a high-speed pursuit during which Sergeant Washburn reached speeds of sixty to seventy miles per hour in a heavily populated residential area with a thirty-mile-per-hour speed limit. Sergeant Washburn believed Defendant was traveling at faster speeds because Defendant's vehicle pulled away from Sergeant Washburn's vehicle during the pursuit. Sergeant Washburn observed Defendant's vehicle run through a red light, almost strike a truck, and fail to stop at a stop sign. The pursuit ended once Defendant turned onto a dead-end street.

Officers ordered Defendant and his passenger to exit the vehicle. Sergeant Washburn testified that Defendant "eventually did get out, got out slowly, kind of nonchalant" and that Defendant "[k]ind of turned and faced us, then turned back away, and then kind of slowly was getting on the ground." Officers handcuffed Defendant, and he and his passenger were taken into custody.

Officers searched Defendant's vehicle and recovered a firearm with "THP" or "Tennessee Highway Patrol" stamped on the lower receiver. JPD Lieutenant David Demoss testified that he located the firearm on the driver's side between the center console area and the area where the driver's leg would have been had the driver remained in the vehicle. Officers searched the firearm on the National Crime Information Center database and learned that the firearm had been reported as stolen. Sergeant Washburn testified that he believed offenders use stolen firearms in crimes to "create some distance" between themselves and the criminal offenses in that "it would be less likely if they used it in a crime to be tied back to them."

JPD Officer Andrew Washburn testified that he assisted other officers in placing Defendant into custody, and he recovered a pair of brass knuckles from Defendant's person. After placing Defendant in the backseat of a police car, Officer Andrew Washburn approached Defendant's vehicle where he saw a black AR-15 rifle with "Tennessee Highway Patrol" stamped or engraved on its side, two magazines, and a .223-caliber cartridge on the ground outside the driver's door. One magazine contained sixteen cartridges, and the other magazine contained thirty-one cartridges. Officer Andrew Washburn searched Defendant's vehicle and located two spent .223-caliber shell casings, the same caliber that can be shot from the recovered firearm. One of the spent shell casings was on the side of the driver's seat between the seat and the door, and the other spent shell casing was on the floorboard on the driver's side. He did not find any spent shell casings on the passenger's side of the vehicle. He noted that the AR-15 rifle weighed between six and eight pounds and was commonly fired using both hands. However, he acknowledged that the rifle could be fired using one hand.

JPD Officer Joseph Mitchell testified that on May 26, 2022, he was dispatched to the area of East Forest Avenue and North Royal Street upon receiving a call of an "active shooter or a ShotSpotter of a vehicle, a tan vehicle, chasing a white vehicle down that street shooting at the second vehicle in front of it." Upon arriving at the scene, Officer Mitchell recovered four spent .223-caliber shell casings on the side of a curb on East Forest Avenue.

THP Trooper Jason Russell testified that during the night of May 13, 2022, or early morning hours of May 14, 2022, his THP-issued rifle was stolen out of his locked patrol vehicle that was parked in his garage in Weakley County, Tennessee. He learned that the rifle was recovered approximately two weeks after it was stolen. At trial, he identified the rifle recovered from Defendant's vehicle as the stolen rifle. Trooper Russell stated that he did not know Defendant and that Defendant did not have permission to possess the rifle.

Trooper Russell testified that the rifle is commonly fired using two hands but that it is not impossible to fire the rifle using one hand. He noted that the THP had begun training officers to fire the rifle using one hand and that "[i]t's difficult that way, very difficult." He stated that when the rifle is fired, the cartridge casing ejects on the right side of the rifle. He said that if a person were shooting the rifle from outside the driver's side of a vehicle, the cartridge casings would eject toward the vehicle and either strike the outside of the vehicle or enter the vehicle through the driver's side window.

The State rested its proof, and Defendant chose not to present any evidence in his defense. The jury acquitted Defendant of the aggravated assault charges. The jury convicted Defendant of evading arrest in a motor vehicle with risk of death or injury, two counts of attempted second degree murder as lesser-included offenses of attempted first degree murder, two counts of employing a firearm during the commission of or attempt to

commit a dangerous felony, theft of a firearm valued at less than $2,500, reckless driving, failure to obey a traffic control device, and failure to stop at a stop sign.

## B. Sentencing Hearing

During Defendant's April 22, 2024 sentencing hearing, the State entered Defendant's presentence report as an exhibit. According to the presentence report, the twenty-two-year-old Defendant was convicted of reckless driving in September 2021 and received a sentence of six months of probation. In August 2020, he was convicted of three counts of burglary of an automobile, all of which occurred on the same day, and he received judicial diversion. In 2019, he was sent to juvenile detention for theft of property valued at less than $1,000, forgery, and unruly behavior, and he received his high school diploma while in custody.

According to the presentence report, Defendant reported that he began using marijuana at the age of sixteen, that he was sent to Youth Town as a juvenile due to his marijuana use, and that he did not successfully complete the program due to non-compliance. He reported that he last used marijuana in 2022. While on probation, he tested positive for marijuana in August 2020 and April 2022. He indicated that he had been diagnosed with bipolar disorder and insomnia in 2016 and that he had received treatment at Pathways for his mental health issues. He received a risk score of moderate in the risk-needs assessment.

Defendant presented the testimony of his mother and other relatives and friends regarding his strong family support system, his prior criminal history, his mental health struggles, and his prior mental health treatment. The witnesses affirmed that they would support Defendant if he received an alternative sentence.

In rebuttal, the State presented the testimony of Ernika Willis, a probation/parole officer with the Tennessee Department of Correction. Ms. Willis began supervising Defendant on August 3, 2020, after he received three years of judicial diversion for his automobile burglary convictions in Crockett County. She affirmed that Defendant was on judicial diversion when he committed the instant offenses in May 2022. She filed a violation warrant, but a hearing on the violation had been continued pending resolution of the instant case. Ms. Willis testified that as a condition of Defendant's diversion, he was to seek treatment from Pathways, follow any recommendations, and provide documentation to her monthly regarding his treatment. Defendant, however, failed to provide any such documentation. Ms. Willis testified that Defendant was prohibited from possessing any firearms as a condition of his diversion and that he was aware of this restriction.

In imposing the sentences, the trial court stated that it considered the evidence presented during the trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments regarding sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and arguments presented by the parties regarding the application of mitigating and enhancement factors, and the statistical information regarding the sentencing practices for these types of offenses. The court reviewed the evidence presented at trial and stated that the criminal conduct involved was "obviously very serious because it involves the attempted murder of two different individuals, along with endangering other individuals who were traveling the roadway that afternoon[,] and . . . the officers were placed in danger by [Defendant's] driving as well." The court considered the testimony of Defendant's family members and other members of his support system with respect to Defendant's potential for rehabilitation and need for treatment.

The court found that Defendant was a Range I standard offender. The court applied enhancement factor (1), Defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[,]" noting that Defendant had been placed on judicial diversion for three automobile burglary convictions in Crockett County and had used marijuana since the age of sixteen. Tenn. Code Ann. § 40-35-114(1). The court applied enhancement factor (8), Defendant, "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[,]" due to Defendant's failure to comply with the conditions of judicial diversion. *Id*. § 40-35-114(8). The court applied enhancement factor (9), Defendant employed a firearm during the commission of the offense, to Defendant's convictions for attempted second degree murder. *Id*. § 40-35-114(9). The court applied enhancement factor (10), Defendant "had no hesitation about committing a crime when the risk to human life was high." *Id*. § 40-35-114(10). In applying this enhancement factor, the court conducted an extensive review of the evidence presented at trial, including evidence of Defendant's prior threats to Ms. Wallace, his firing a stolen AR-15 assault rifle at Ms. Wallace and Mr. Brown while in traffic, and his leading officers in a high-speed pursuit through a residential area while running stop signs and red lights and endangering the lives of officers and other motorists. The court applied enhancement factor (13) because Defendant was on judicial diversion at the time that the felonies were committed. *Id*. § 40-35-114(13). Finally, the court applied enhancement factor (16), Defendant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult," due to Defendant's prior juvenile adjudication for forgery, which the court found to be a felony offense had the charge been brought in criminal court. *Id*. § 40-35-114(16). The court applied "great weight" to each of the enhancement factors.

In reviewing the mitigating factors, the court noted the testimony of Defendant's family and friends regarding their support and efforts to "nurture" and "guide" Defendant. The court stated that "their efforts have not proven successful, unfortunately," that they "have done everything [they] can," and that Defendant "doesn't want to listen" to them. The court stated that Defendant had been given multiple "opportunities," including release programs in the juvenile system, judicial diversion, and treatment programs through Pathways, but that he failed to abide by the programs' rules and conditions. The court noted Defendant's youth and work history and gave "some slight weight for mitigation in terms of [Defendant's] having worked some in the past."

The court reviewed Defendant's criminal history, his history of drug use, and his history of failing to comply with conditions involving release into the community and found that Defendant failed to establish that he had potential for rehabilitation. The court expressed concern that Defendant "would commit other crimes if he was on some kind of release into the community because that's exactly what he did this last time." The court found that Defendant would not abide by the terms of probation "because he was on probation when he committed these offenses" and that the interests of society in being protected from Defendant's future criminal conduct was great. The court also found that measures less restrictive than confinement had frequently or recently been applied to Defendant without success. *See* Tenn. Code Ann. § 40-35-103(1)(C).

The court imposed sentences of confinement of four years for the evading arrest conviction, twelve years for each conviction of attempted second degree murder, six years at 100 percent for each firearm conviction, two years for the theft of a firearm conviction, six months for the reckless driving conviction, and thirty days for each traffic-related conviction.

The court examined the facts and circumstances of the offenses in determining whether to impose consecutive sentences. The court noted that the offenses involved four separate criminal episodes: (1) Defendant's possession of a stolen AR-15 rifle; (2) his shooting the rifle at Ms. Wallace and Mr. Brown; (3) his felony evading arrest, which created a risk of death of law enforcement officers and other motorists on the roadway; and (4) his employing the firearm during the commission of the dangerous felony offenses. In determining that consecutive sentences were warranted, the court found that Defendant committed the offenses while he was on probation. *See* Tenn. Code Ann. § 40-35-115(b)(6). The court also found that Defendant was an offender whose record of criminal activity was extensive. *See id.* § 40-35-115(b)(2). The court reasoned that Defendant had been

> convicted [of] a felony offense as a juvenile and then he had three more convictions for which he pled guilty in Crockett County and then he has all

of these offenses for which he's being sentenced for today, which is a very extensive record when you look at the time, the scope, and the . . . number of convictions, I do find this to be extensive.

Additionally, the court found that Defendant was a dangerous offender whose behavior indicates little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life is high. *See id*. § 40-35-115(b)(4). The court found that the circumstances surrounding the commission of the offenses were aggravated, that confinement for an extended period was necessary to protect society "from this defendant's unwillingness to lead a productive life and . . . the defendant's resort to criminal activity in furtherance of his antisocial lifestyle," and that the aggregate length of the sentences was reasonably related to the severity of the offenses for which Defendant was convicted. The court emphasized the "destructive" nature of the AR-15 rifle and reasoned that Defendant

> could have done a lot of damage to other individuals who were out there in that area on that particular day, and I know he was firing specifically at Mr. Brown's vehicle, he was firing specifically at Ms. Wallace's vehicle, but there again, this AR[-]15 rifle, when they found it in the vehicle, it had 48 live rounds . . . in the vehicle. There were two magazines that had a total of 48 live rounds. [That] . . . could cause a lot of destruction and a lot of heartache.
>
> Had this young man, I mean, if he had gotten away from the police out there that day, he'd been out here using that AR[-]15 rifle to commit other crimes and that's sad, but it's probably true.

The court found that pursuant to the statute, Defendant was required to serve his six-year sentence for each conviction of employing a firearm during the commission of or attempt to commit a dangerous felony consecutively to his twelve-year sentence for the corresponding conviction of attempted second degree murder. *See* Tenn. Code Ann. § 39-17-1324(e)(1). The court ran the twelve-year sentences for the attempted second degree murder convictions concurrently with each other, the six-year sentences for the firearm convictions concurrently with each other, and the sentences for the evading arrest conviction and the driving convictions concurrently with each other. The court ordered Defendant to serve his four-year sentence for his evading arrest conviction, his effective twelve-year sentence for the two attempted second degree murder convictions, his effective six-year sentence for the two firearm convictions, and his two-year sentence for the theft of a firearm conviction consecutively, for an effective sentence of twenty-four years of confinement.

- 9 -

Defendant filed a timely motion for new trial, which the trial court denied following a hearing. Defendant then filed a timely notice of appeal.

## II. Analysis

On appeal, Defendant challenges the sufficiency of the evidence supporting his attempted second degree murder and firearm convictions. He also asserts that his sentences are excessive.

### A. Sufficiency of the Evidence

In challenging the sufficiency of the evidence supporting his convictions for attempted second degree murder, Defendant asserts that the State failed to establish that he fired the shots intending to harm Ms. Wallace or Mr. Brown and that his actions were merely reckless. Defendant maintains that because the attempted second degree murders are the underlying dangerous felonies for his convictions of employing a firearm during the commission of or attempt to commit a dangerous felony, the firearm convictions likewise cannot stand. The State responds that the evidence is sufficient to support Defendant's convictions. We agree with the State.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(c). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id*. at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the

evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Defendant was charged in the indictment with two counts of attempted first degree murder by taking a substantial step by shooting at the victims, and he was convicted of attempted second degree murder. Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). As it relates to the instant case, Code section 39-12-101(a) provides:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> . . . .
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Thus, the State was required to prove that Defendant "took a substantial step toward committing a knowing killing" of Ms. Wallace and Mr. Brown. *State v. Miller*, 638 S.W.3d 136, 160 (Tenn. 2021) (citing Tenn. Code Ann. § 39-13-101(a)(3)). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b); *see Miller*, 638 S.W.3d at 160. "Thus, as for the defendant's intent, the State was only required to prove that the defendant knew his actions were reasonably certain to cause [the victim's] death." *Miller*, 638 S.W.3d at 160 (citing *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010)). "Whether the defendant acted 'knowingly' is a question of fact for the jury and may be inferred from the surrounding facts and circumstances." *Id.* at 160-61 (citing *Brown*, 311 S.W.3d at 432).

It is also a criminal offense to employ a firearm during the commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b). Attempted second degree murder is one of the enumerated dangerous felonies. *Id.* § 39-17-1324(i)(1)(B).

The evidence presented at trial, when viewed in the light most favorable to the State, established that after the relationship between Defendant and Ms. Wallace ended, Defendant threatened Ms. Wallace that if he caught her with someone else, "it was over for [her]." On another occasion, Defendant followed Ms. Wallace as she was driving with a friend, and Ms. Wallace called the police as a result. On the date of the shooting, Defendant arrived at Ms. Wallace's apartment complex while armed with a stolen AR-15

rifle and a large quantity of ammunition. Although Defendant previously had visited his son at Ms. Wallace's apartment, Defendant was not scheduled to be at the apartment on the day of the shooting. Defendant waited in his vehicle outside the apartment until Ms. Wallace and Mr. Brown exited the apartment. Ms. Wallace drove out of the parking lot of the apartment complex followed by Mr. Brown. Defendant followed them in his vehicle for some distance before he opened fire, shooting multiple shots with the AR-15 rifle. Both Ms. Wallace and Mr. Brown testified to hearing multiple gunshots, which caused them to be in fear. During the shooting, Ms. Wallace looked in her rearview mirror and saw Defendant hanging out of the driver's side window of his vehicle with "something pointed out of the window." Although Defendant argues that no evidence was presented establishing that he shot at Ms. Wallace and Mr. Brown, Ms. Wallace testified to seeing bullets fly past her vehicle's window. Ms. Wallace turned onto a dead-end street, and Defendant continued following Mr. Brown until Mr. Brown was able to flag down a police officer. Defendant then led officers in a high-speed pursuit through a residential area. It was only after Defendant turned onto a dead-end street that officers were able to apprehend him.

Defendant asserts that his actions were merely reckless. He cites to testimony regarding the difficulty in firing an AR-15 rifle using one hand and notes that neither the victims nor their vehicles were struck by bullets. However, whether Defendant acted knowingly or intentionally was a question of fact for the jury. *Miller*, 638 S.W.3d at 160-61. The jury rejected Defendant's claim that his actions were reckless, which was their prerogative, and we will not reweigh the evidence. We conclude that when viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's attempted second degree murder convictions.

Defendant's challenge to the sufficiency of the evidence supporting his convictions for employment a firearm during the commission or attempt to commit a dangerous felony is based on his challenge to the sufficiency of the evidence supporting attempted second degree murder as the underlying dangerous felony. Because the evidence is sufficient to support Defendant's attempted second degree murder convictions, the evidence is likewise sufficient to support his firearm convictions.

### B. Sentencing

Defendant contends that the trial court erred in imposing the maximum sentence for each conviction and in ordering partial consecutive sentences. The State responds that the trial court properly exercised its discretion in imposing the sentences. We agree with the State.

We review the length and manner of service of within-range sentences imposed by a trial court under an "abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). Our supreme court has stated that "the abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions." *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)). This standard also applies to "questions related to probation or any other alternative sentence," *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012), as well as to a trial court's decision to impose consecutive sentencing, *see Pollard*, 432 S.W.3d at 860.

Nevertheless, to be afforded deference on appeal, the trial court must "place on the record any reason for a particular sentence." *Bise*, 380 S.W.3d at 705. There is no presumption of reasonableness when the trial court fails to consider and weigh the applicable factors. *King*, 432 S.W.3d at 327-28; *Caudle*, 388 S.W.3d at 279. However, as this court has observed:

> [T]rial courts need not comprehensively articulate their findings concerning sentencing, nor must their reasoning be "particularly lengthy or detailed." *Bise*, 380 S.W.3d at 706. Instead, the trial court "should set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision[-]making authority." *Id*.

*State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *4 (Tenn. Crim. App. Apr. 12, 2023) (alterations in original), *no perm. app. filed*.

We will uphold the trial court's sentencing decision on appeal "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. A defendant bears the burden of proving that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

### 1. Length of Individual Sentences

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the

principles of sentencing and arguments regarding sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts regarding sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the Tennessee Department of Correction and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(4), (5). The trial court is "to be guided by--but not bound by--any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706.

As a Range I offender, Defendant was subject to a sentence of eight to twelve years for attempted second degree murder, a Class B felony; two to four years for evading arrest in a motor vehicle with risk of death or injury, a Class D felony; and one to two years for theft of a firearm valued at less than $2,500, a Class E felony. *See* Tenn. Code Ann. §§ 39-12-107(a), 39-13-210(c)(1), 39-14-105(a)(2), 39-16-603(d)(2)(B), 40-35-112(a). He also was subject to a maximum sentence of six months for reckless driving, a Class B misdemeanor, and a maximum sentence of thirty days for failing to obey a traffic control device and failing to stop at a stop sign, Class C misdemeanors. *See id*. §§ 40-35-111(e), 55-8-110, 55-8-149, 55-10-205(d)(1). The trial court imposed the maximum sentence within each applicable range for each conviction. The trial court also imposed the mandatory minimum six-year sentence for each of the convictions for employing a firearm during the commission of a dangerous felony. *See id*. § 39-17-1324(h)(1).

Defendant asserts that the trial court failed to consider the purposes and principles of sentencing in imposing the maximum sentence for each conviction. However, the trial court expressly stated that it considered the principles of sentencing in imposing the sentences and made extensive findings reflecting its application of the relevant sentencing principles. The trial court applied numerous enhancement factors, made detailed findings to support these enhancement factors, and assigned specific weight to the applicable enhancement factors. The court emphasized the serious nature of the offenses and Defendant's actions, which endangered not only the lives of Ms. Wallace and Mr. Brown but also the lives of other motorists. The court considered Defendant's criminal history of failing to comply with the conditions involving his release into the community despite the support that he received from family and friends, his youth and work history, his previous failure to comply with mental health treatment efforts, and his lack of potential for

- 14 -

rehabilitation. Because the trial court imposed within-range sentences based on its consideration of the purposes and principles of sentencing, we review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *See Bise*, 380 S.W.3d at 708.

Defendant argues that the trial court misapplied enhancement factor (10), that Defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10). He maintains that no proof was presented that his actions placed anyone other than Ms. Wallace and Mr. Brown at risk. *See State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017) (holding that enhancement factor (10) "is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim"). However, the proof presented at trial established that the offenses occurred at approximately 4:30 p.m., that other motorists and police officers were in the area, and that Defendant almost struck another motorist while fleeing from the police. Based on this evidence, the trial court properly applied enhancement factor (10).

Regardless, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Defendant does not challenge the trial court's application of five other enhancement factors. Rather, he argues that the trial court did not properly consider mitigation evidence. However, the record reflects that the trial court considered Defendant's youth and employment history in mitigation but gave the evidence "slight weight." The court also noted the support from Defendant's family and friends but declined to consider this support in mitigation in light of Defendant's continued failure to abide by the rules and conditions of treatment programs and other release programs despite this support. To the extent that Defendant challenges the weight assigned by the trial court to the mitigation evidence, "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Id.* We conclude that the trial court properly exercised its discretion in imposing the maximum sentences within the applicable range for each conviction.

## 2. Consecutive Sentences

Under Tennessee Code Annotated section 40-35-115, a trial court has discretion to order a defendant convicted of more than one offense to serve the sentences consecutively if the court finds at least one of the statutory grounds to be present. *Pollard*, 432 S.W.3d at 859-60; *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013). Relevant to this case, a trial court may order consecutive sentencing upon finding by a preponderance of the evidence that the defendant has a record of "criminal activity" that is "extensive," that the defendant committed the offense while on probation, or that the defendant "is a dangerous

offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]"  Tenn. Code Ann. § 40-35-115(b)(2), (4), (6).

When evaluating whether the proof establishes that a defendant is an offender whose record of criminal activity is extensive, trial courts may consider the following list of non-exclusive factors:

> (1) The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;
> (2) The time span over which the criminal activity occurred;
> (3) The frequency of criminal activity within that time span;
> (4) The geographic span over which the criminal activity occurred;
> (5) Multiplicity of victims of the criminal activity; and
> (6) Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*State v. Perry*, 656 S.W.3d 116, 129 (Tenn. 2022) (footnotes omitted).  "[A] defendant need not have prior criminal convictions or activity to qualify as an offender whose record of criminal activity is extensive for purposes of section 40-35-115(b)(2)." *Id.* at 131.  When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed.  *See State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995).[1]

We note that pursuant to Code section 39-17-1324(e)(1), Defendant is required to serve his six-year sentence for each conviction of employing a firearm during the commission of a dangerous felony consecutively to his twelve-year sentence for the corresponding attempted second degree murder conviction.  Furthermore, Defendant does not challenge the trial court's finding that he was sentenced "for an offense committed while on probation" as a basis for the trial court's discretionary imposition of consecutive

---

[1] The State argues in a footnote in its brief that "*State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 2005), was incorrectly decided and should be overturned."  Our supreme court has recognized that the application of an abuse of discretion with a presumption of reasonableness standard of review when considering consecutive sentencing based upon the "dangerous offender" category in Code section 40-35-115(b)(4) does not eliminate the requirements in *Wilkerson*.  *Pollard*, 432 S.W.3d at 863.  We are bound by the holdings of our supreme court.

sentences. Tenn. Code Ann. § 40-35-115(b)(6). This factor alone supports the trial court's imposition of partial consecutive sentences. Regardless, the record supports the trial court's finding that Defendant has a record of "criminal activity" that is "extensive" and that Defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" *Id.* § 40-35-115(b)(2), (4).

Defendant challenges the trial court's finding that he has a history of criminal activity that is extensive, arguing that his "profile is not that of a hardened criminal that the extensive criminal activity category seeks to target" and that he "is instead a very young man who has had some impulse control issues in his youth." The record reflects that Defendant had prior juvenile adjudications for theft, forgery, and unruly behavior; that he was convicted of three counts of burglary of an automobile in August 2020 and reckless driving in September 2021; that he committed the instant offenses in May 2022 while on judicial diversion; and that he began using marijuana at the age of sixteen and continued using the drug until 2022. The trial court determined that based on the time, space, and scope of Defendant's criminal activity, such criminal activity was extensive pursuant to Code section 40-35-115(b)(2). The record supports the trial court's imposition of partial consecutive sentencing on this basis.

Defendant next asserts that the trial court failed to make the requisite *Wilkerson* findings in determining that he is a "dangerous offender" pursuant to Code section 40-35-115(b)(4). He maintains that the trial court merely recited the *Wilkerson* factors without making specific findings. The State responds that a trial court need not make the additional findings set forth in *Wilkerson* if the court imposes consecutive sentences based on multiple factors in Code section 40-35-115. We need not reach this issue, however, because we conclude that the trial court's findings regarding the *Wilkerson* factors are supported by the record.

The trial court determined that consecutive sentencing was "necessary to protect the public against further criminal conduct by the defendant." *Wilkerson*, 905 S.W.2d at 939. Prior to making this finding, the trial court highlighted the extensive nature of Defendant's history of criminal activity. The trial court further noted Defendant's unwillingness to "lead a productive life" and his "resort to criminal activity in furtherance of his antisocial lifestyle." The trial court also found that consecutive sentencing is "reasonably relate[d] to the severity of the offenses committed." *Id.* The trial court discussed the aggravated nature of the circumstances surrounding the commission of the offenses, including his use of an AR-15 rifle to shoot at the vehicles of Mr. Brown and Ms. Wallace, his procurement of a large amount of ammunition, and the risk that his actions posed to others. Thus, the record reflects that the trial court found that both *Wilkerson* factors existed and stated the basis for its findings. Therefore, the trial court properly ordered partial consecutive

- 17 -

sentences on the basis that Defendant is a "dangerous offender" pursuant to Code section 40-35-115(b)(4).

Finally, Defendant asserts that the trial court failed to consider the purposes and principles of sentencing when imposing consecutive sentences. However, the trial court specifically stated that it considered the principles of sentencing and referenced sentencing principles throughout its findings, including the seriousness of the offenses, Defendant's prior criminal history, and his lack of potential for rehabilitation. The record reflects that the trial court imposed a sentence that was consistent with the purposes and principles of sentencing, and Defendant has failed to establish that the trial court abused its discretion in imposing partial consecutive sentences.

## III. Conclusion

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE